# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 15-1526V
Filed: January 8, 2025

| | |
|---|---|
| * * * * * * * * * * * * * * * | |
| ABIGAIL SIMS *and* DANIEL SIMS, *on behalf of their deceased daughter*, A.E.S., | * * * |
| Petitioners, | * |
| v. | * * |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * * * |
| Respondent. | * * |
| * * * * * * * * * * * * * * * | |

*Michael McLaren, Esq.*, Black McLaren, et al., PC, Memphis, TN, for petitioners.
*Voris Johnson, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

**Roth**, Special Master:

On December 15, 2015, Abigail and Daniel Sims ("petitioners") filed a petition on behalf of their minor daughter, A.E.S., for compensation under the National Vaccine Injury Compensation Program.[2] Petitioners allege that A.E.S. died on December 16, 2013, as a result of the Pediarix (DTaP/IPV/HepB), Hib, PCV13, and RotaTeq vaccinations she received that day. Petition, ECF No. 1.

A Ruling on Entitlement was issued on March 7, 2024, finding petitioners entitled to compensation. ECF No. 97. As this is a death case, the $250,000.00 statutory death benefit applies. § 300aa-15(a)(2), (4). The only damages in dispute are pain and suffering.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

1

The parties were unable to come to an agreement on an amount for pain and suffering damages and agreed to have the issue resolved by ruling on the record. They submitted simultaneous briefs outlining their respective positions. ECF No. 104-05.

After consideration of all the evidence and for the reasons detailed below, I find that petitioners are entitled to **$50,000.00** for A.E.S.'s pain and suffering.

### I.     Relevant Procedural History

Petitioners filed their petition on December 15, 2015. ECF No. 1.

An entitlement hearing was held via Zoom on December 17 and 18, 2020. ECF No. 55. Following the hearing, both parties filed additional literature, and respondent filed a supplement expert report. Resp. Ex. F, Tabs 1-6, ECF No. 86; Pet. Ex. 144-151, ECF No. 87.

The parties filed simultaneous post-hearing briefs on May 3, 2021. ECF Nos. 89-90. On March 7, 2024, a Ruling on Entitlement was issued, finding petitioners entitled to compensation. ECF No. 97. The case then proceeded to damages. ECF No. 98.

After several months of negotiation, petitioner filed a motion for a status conference on July 31, 2024. ECF No. 102. The motion outlined petitioners' position, that they were seeking pain and suffering and the statutory death benefit as set forth in their demand to respondent on June 4, 2024, and that no Medicaid lien existed. *Id*. Further, petitioners explained that respondent proposed a proffer amount on June 20, 2024, that petitioner agreed to on July 16, 2024. However, after respondent provided the proposed written proffer, petitioners asked whether certain language could be added to clarify petitioners' rights should respondent seek review of the entitlement decision. *Id*. Respondent then withdrew the proffer on July 23, 2024, and the parties' damages discussions reached an impasse. With the consent of respondent, petitioners requested a status conference to discuss the resolution of damages. Respondent asked that the conference be recorded. *Id*.

A recorded status conference was held on August 20, 2024, and the parties agreed to submit simultaneous briefs for a ruling on the record on damages. ECF No. 103.

On October 21, 2024, the parties simultaneously filed their respective briefs in support of damages. ECF Nos. 104-05.

The issue of pain and suffering is now ripe for adjudication.

### II.    Overview of the Case

At approximately 11:00 am on December 16, 2013, A.E.S. was administered Pediarix, Hib, PCV13, and Rotateq vaccinations at her two-month well-baby check-up. She was 11 weeks old. *See* Petition, ECF No. 1; Amended Petition, ECF No. 60. Between 5:45 and 6:15 pm, A.E.S. was found in her bassinet face up and barely breathing with a pale blue tint to her skin. A.E.S. stopped

breathing on the way to the hospital. Despite resuscitation efforts, A.E.S. was pronounced dead at approximately 7:15 pm. Amended Petition at 1.

Petitioners alleged that the vaccinations administered to A.E.S. caused her to suffer a Table encephalopathy leading to her death or, alternatively, an off-Table encephalopathy, pulmonary edema, visceral congestion, and death. Amended Petition at 1. Entitlement was found on both the Table and off-Table claims. *See* Ruling on Entitlement, ECF No. 97.

### III. Legal Framework

The Vaccine Act provides for compensation for pain and suffering, including "actual and projected pain and suffering and emotional distress from the vaccine-related injury…not to exceed $250,000." § 15(a)(4). The petitioner bears the burden of proof for each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

In the instant matter, petitioners seek an award for pain and suffering in addition to the statutory death benefit. Pain and suffering and emotional damages are "inherently subjective" and cannot be calculated mathematically. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013). In determining an award of pain and suffering, special masters should consider the awareness of the injury, severity of the injury, and duration of the suffering. *Id.*; *McAllister v. Sec'y of Health & Human Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995).

In the past, special masters determined pain and suffering on a continuum, where only the most severely injured received the full $250,000.00 amount available for pain and suffering. *See, e.g.*, *Hocraffer v. Sec'y of Health & Human Servs.*, No. 99-533V, 2007 WL 914914, at *5-6 (Fed. Cl. Spec. Mstr. Feb. 28, 2007) (discussing the development of the "continuum of injury" for awards of pain and suffering). This approach was explicitly rejected by the Court of Federal Claims in 2013. In *Graves v. Sec'y of Health & Human Servs.*, Judge Merow stated that this approach forced "all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." 109 Fed. Cl. 579, 589-90 (2013). Instead, pain and suffering damages should be assessed independently of the $250,000.00 statutory limit, after which the cap is "applied." *Id.* at 587-88. Judge Merow determined the appropriate award of pain and suffering damages using the three McAllister factors and looking to prior pain and suffering awards made in both Vaccine Program cases and comparable injury cases outside of the Vaccine Program. *Id.* at 589-91. Similarly, a special master may look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering. *Jane Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.").

### IV.     The Parties' Arguments

**A. Petitioners' Arguments**

Petitioners argue that A.E.S. suffered from extreme pain, suffering, and distress, and accordingly request an award of $250,000.00 for her pain and suffering. Thus, petitioners request damages in the amount of $500,000.00, comprised of $250,000.00 in pain and suffering and the $250,000.00 statutory death benefit. Petitioners' Brief ("Pet. Br.") at 12.

Petitioners contend that A.E.S. received her vaccinations between 11:00 and 11:30 am, and that the nurse was "heavy-handed with the shot and jabbed [A.E.S.] harder than Ms. Sims thought necessary." Pet. Br. at 10. That afternoon, A.E.S. was whimpering, fussy, whining, with "a quiet look in her eye", not focusing, and Mrs. Sims had to comfort her and "respond[] to her persistent distress." Pet. Br. at 10 (citing Pet. Ex. 2 at 16-19; Pet. Ex. 7 at 9; Tr. 21-22; Pet. Ex. 135 at 2). When awake, A.E.S. whined quietly, as though she had a headache and did not want to make noise. Pet. Br. at 10 (citing Tr. 40). Mrs. Sims walked with her and soothed her, knowing she did not feel well after her shots. Once at the hospital, Mrs. Sims watched as the medical professionals administered medications and performed chest compressions and suctioning. Pet. Br. at 10 (citing Tr. 30, 40).

Mr. Sims described A.E.S as very tired that afternoon. When he went to check on A.E.S. after laying her down for a nap, he found her face up in her bassinet with her mouth open, eyes slightly closed, and in a state of hyperextension with her arms extended. Pet. Br. at 11. A.E.S. was pale and her lips were blue. When Mr. Sims picked her up, she made a sound like exhaling. Once at the hospital, Mr. Sims also watched as the doctors attempted to resuscitate and "revive his baby." *Id*. The parents knew A.E.S. was still alive because they felt a pulse and she was shallowly breathing when Mr. Sims found her at approximately 6:15 pm. Further, she had a pulse but decreased respirations upon presentation to the ER. *Id*. (citing Pet. Ex. 7 at 1, 7).

Petitioners' expert Dr. Shuman described the irritability, difficulty and inability to be consoled, and lack of visual gaze responsiveness as A.E.S. being in the process of encephalic encephalopathy. Pet. Br. at 7 (citing Tr. 17-20, 141). He further noted that A.E.S. was fed her last bottle just prior to being put in her bassinet at 5:30 pm, but she did not feed well, which is another indication of abnormal encephalic functioning. Pet. Br. at 7-8. When A.E.S. was found at 6:15 pm, she was struggling to breathe in a position of "hyperextension and she had her arms extended." *Id*. at 8 (quoting Tr. 140). Dr. Shuman referred to this positioning as "decerebrate posture", indicative of axial herniation and a sign of encephalopathy. Pet. Br. at 11 (quoting Tr. 140). A.E.S. died shortly thereafter, at approximately 7:15 pm. Pet. Br. at 11; Pet. Ex. 5 at 11, 57-58.

Petitioners argue that A.E.S.'s behaviors indicate her awareness of injury and that she was "able to feel pain and experience distress" in the time between receipt of the vaccinations and her death. Pet. Br. at 7. Dr. Shuman referred to the distant look, not making eye contact, whimpering, and acting like she had a headache as an indication of the distress A.E.S. was experiencing. *Id.* (citing Tr. 142-46). He added that an infant that young cannot express discomfort, but her mother responded to her behaviors by comforting her and responding to "persistent distress." *Id*.

4

Petitioners submitted that they were not aware of any reasoned decisions by a special master awarding pain and suffering damages for a vaccine-related infant death in the Vaccine Program but provided the following cases to assist the court in its decision. Pet. Br. at 8.

Petitioners submitted *Boatmon v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 566 (2018), *aff'd on other grounds*, 941 F.3d 1351 (Fed. Cir. 2019). *Boatmon* involved the death of a five-month-old infant the day after vaccination. Like A.E.S., he was a healthy baby who received his vaccines at a well-baby visit. He then stopped laughing and cooing, and became quiet and withdrawn later that day. He developed a fever that night, did not sleep well, and was found unresponsive following a nap the next day. He died shortly thereafter. Pet. Br. at 8. After entitlement was found for petitioners, respondent filed a proffer of $300,000.00 for all damages. *Id*. Petitioners herein infer that based on the proffer, respondent valued the infant's pain and suffering in *Boatmon* at $50,000.00. *Id*. at 9. Petitioners argue that the fact that petitioners in *Boatmon* stipulated to that amount of damages does not mean the amount for pain and suffering was reasonable; petitioners accept proffers for a host of reasons that may have nothing to do with the merits of their case, such as monetary need or the desire to avoid additional delays or the stress of litigation. *Id*.

Petitioners also offered *Oliveira v. Jacobson*, 846 A.2d. 822 (R.I. 2004), a civil action for medical malpractice involving the death of an infant 27 minutes after his birth. Pet. Br. at 9-10. The jury awarded $100,000.00 for pain and suffering based on fact witness testimony that the baby struggled to breath, attempted to cry, gasped for air, was intubated three times, and repeatedly received chest compressions during the 27 minutes of his life, which the Supreme Court concluded was "extremely traumatic and unpleasant." *Id*.; *Oliveira*, 846 A.2d, 827-28. In comparing A.E.S. to the infant in *Oliveira,* petitioners submit that the end of A.E.S.'s life "was extremely traumatic, painful, and distressing." Pet. Br. at 10. Petitioners further argue that *Oliveira* was decided over 20 years ago, so the award for the same or similar pain and suffering should be higher now. *Id*.

### B. Respondent's Arguments

Respondent detailed the medical records, affidavits, and testimony of the petitioners. Respondent's Brief ("Resp. Br.") at 1-4. Specifically, he referred to Mrs. Sims's testimony that A.E.S. cried after her vaccinations, but once nursed calmed down and they went home. Resp. Br. at 4 (citing Tr. 20). Mrs. Sims held A.E.S. on the couch until she had to go to work at 2:30 pm, and during this time A.E.S. was sleepy and fussy, whining and whimpering at a low volume, making eye contact but not in a way that seemed like she was really seeing, cuddling, and feeding every 20 to 30 minutes for comfort. *Id*. (citing Tr. 22). A.E.S. spit up, which was normal, but was not vomiting. *Id*. (citing Tr. 41). Mr. Sims drove Mrs. Sims to work at around 2:50 pm, and the next time she saw A.E.S. was in the ER. *Id*. (citing Tr. 29).

Mr. Sims stated that A.E.S was "very quiet" on the ride home from the doctor's office and seemed "kind of drawn back" and "super spaced out" but not fussy. He attributed her behavior to the vaccines because his sons were the same way after their vaccines. Resp. Br. at 5 (citing Tr. 55, 60, 76-77). He held A.E.S. while his wife got ready for work, then he drove Mrs. Sims to work with the children. Upon returning home, Mr. Sims held A.E.S. on the couch, gave her a bottle, and put her in the bassinet. She was "extremely tired." Resp. Br. at 5 (citing Tr. 55-56, 77). She took

5

longer to feed and did not finish her bottle, but she did not vomit. *Id*. He placed her face up in the bassinet and when he returned, her head was extended back, her mouth was open, and she was half on her side with her arms slightly back. He picked her up and she made a noise as if she was exhaling. He called his wife and drove to the hospital with A.E.S. and his sons. *Id*. (citing Tr. 57-59, 61).

Respondent agreed that petitioners are entitled to the $250,000.00 death benefit based on the ruling on entitlement. Therefore, the only issue to be determined is the appropriate amount for pain and suffering. Resp. Br. at 6.

After outlining the three *Graves* factors for valuing pain and suffering, respondent argued that because A.E.S. was an infant, her ability to understand her injury is impossible to know, and the severity of her injury is "somewhat unclear from the record." Resp. Br. at 7. Respondent noted that petitioners told the medical examiner Mr. Kennedy that A.E.S. had a normal day and fed normally after the vaccinations. Resp. Br. at 7 (citing Pet. Ex. 5 at 10; Pet. Ex. 7 at 1). However, at hearing and in their affidavits, petitioners described A.E.S. as spaced out, quiet, sleepy, distant, and fussy, but nothing so concerning that they felt the need to seek medical attention. Thus, "[i]t would therefore seem that whatever symptoms A.E.S. experienced prior to her death were not overly severe." *Id*. Further, the duration of her injury was at most six-and-a half hours, and therefore any pain and suffering award should fall on the lower end of the spectrum. *Id*.

Respondent argued that *Boatmon* is the most comparable recent case in the Program. *Boatmon*, 138 Fed. Cl. 566. In that case, the infant received his four-month immunizations, developed a fever that night, did not sleep well, was given Advil at 4:00 am and 8:00 am for his ongoing fever, and was found unresponsive in his crib around 2:30 pm the following afternoon. Petitioners were found entitled to compensation and accepted a proffer of $300,000.00 in damages. Resp. Br. at 7-8; *see Boatmon v. Sec'y of Health & Human Servs.*, No. 13-611V, 2018 WL 829155, at *1 (Fed. Cl. Spec. Mstr. Jan. 19, 2018). According to respondent, the amount indicates that the parties agreed to $50,000.00 for the infant's pain and suffering in that case. Resp. Br. at 8.

Therefore, respondent argued that the award for pain and suffering should not exceed $50,000.00, and the Court should take into consideration that the duration of the injury in *Boatmon* was longer than the duration in this case. Resp. Br. at 8.

Respondent concluded that the $250,000.00 death benefit and an amount arguably less than $50,000.00 that fairly compensates A.E.S.'s estate for her pain and suffering prior to her death is an appropriate award in this case. Resp. Br. at 8.

## V.   Discussion

### A. Actual Pain and Suffering

Petitioners' request for compensation for pain and suffering is based on the vaccine-injured individual's ability to understand the injury, the degree of severity of the injury, and the duration of time that the individual is subjected to the injury. *McAllister v. Sec'y of Dep't of Health & Human Servs.*, No. 91-1037V, 1993 WL 777030 at *3 (Fed.Cl. Spec. Mstr. Mar. 26, 1993), *vacated*

6

*on other grounds sub nom. McAllister v. Sec'y of Health & Human Servs.*, 70 F.3d 1240 (Fed. Cir. 1995). The ability to comprehend an individual's injury can be understood by looking to the individual's awareness of their injury or pain. *See id.* (petitioner's "mental cognition" to recognize and appreciate her loss was considered). Special masters also consider the age of the individual in the analysis of emotional suffering. *See DeLozier, next friend of L.T. v. Sec'y of Health & Human Servs.*, 152 Fed. Cl. 558, 564 (2021) (awarding $50,000.00 for a less severe subtype of alopecia due to petitioner suffering the stigma and embarrassment of hair loss at 3-5 years old and considering her age against that of a teenager or adult in the same situation). Awareness of an injury "is often deemed a function of whether the injured party was mentally competent . . . suggesting that injuries experienced by an infant or very young child, whose mental cognition was not yet fully developed, might not meet these criteria." *See DeLozier, next friend of L.T. v. Sec'y of Health & Human Servs.*, No. 15-124V, 2020 WL 5742643 at *4 (Fed. Cl. Spec. Mstr. Aug. 11, 2020), *review granted, cause remanded*, 152 Fed. Cl. 558 (2021), *order clarified*, 154 Fed. Cl. 392 (2021).

The duration of an individual's injury relates to the length of time the individual suffered[3] the injury from onset onward. *See McAllister*, No. 91-1037V, 1993 WL 777030 at *3. Larger awards are applied to cases where the individual experiences the most extreme pain for the longest time prior to death. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579, 588 (2013). Special masters have held that a period of days or months is relatively brief when compared to other vaccine-injured petitioners who suffer over years or decades. *Id.* at 589. However, the Court of Federal Claims has emphasized the importance of examining what occurred throughout the duration of the injury, leading to the discussion of severity. *Compare id.* at 580 (awarding the statutory cap for pain and suffering to a child who died forty-five days after onset of symptoms because she suffered from unremitting seizures) *with Bragg v. Sec'y of Health & Human Servs.*, No. 08-477V, 2012 WL 404773 (Fed. Cl. Spec. Mstr. Jan. 18, 2012) (awarding $25,000.00 to an 82-year-old individual who experienced fever, dehydration, and difficulty breathing resulting in intubation for six days prior to his death). When a child's suffering was limited to hours or days rather than months, special masters have awarded less for pain and suffering. *Boatmon v. Sec'y of Health & Human Servs.*, No. 13-611V, 2018 WL 829155, at *1 (Fed. Cl. Spec. Mstr. Jan. 19, 2018) (suggesting that respondent's proffer indicated that $50,000.00 of the compensation awarded was for the pain and suffering of a five-month-old who died within one day of vaccination).[4]

The severity of an injury relates to the amount of pain or loss of normal function imposed by the injury. *See DeLozier*, 2020 WL 5742643 at *4. Special masters have looked towards continued pain and treatment of the injury in determining the severity for purposes of awarding pain and suffering. *Compare Pozil v. Sec'y of Health & Human Servs.*, No. 21-0351V, 2023 WL 7106486 at *5 (Fed. Cl. Spec. Mstr. Aug. 2, 2023) (awarding $145,000.00 when petitioner reported pain for less than two months after multiple surgeries for restorative dental work because his initial treatment and surgery was extensive) *and Marcillo v. Sec'y of Health & Human Servs.*, No. 20-

---

[3] The length of time that the injury will persist is also a factor when considering future pain and suffering. In this case, A.E.S. is deceased so there is no calculation to be made regarding A.E.S.'s future pain and suffering.

[4] As discussed in both parties' briefs on damages, the ruling on entitlement in *Boatmon* was ultimately reversed by the Federal Circuit. Pet. Br. at 8; Resp. Br. at 8. However, due to the factual similarities, the parties' determination of damages in *Boatmon* is still instructive in the instant matter.

2061V, 2023 WL 3452274 at *7 (Fed. Cl. Spec. Mstr. May 15, 2023) (awarding the $250,000.00 pain and suffering maximum because petitioner underwent extraordinary initial treatment, suffered an infection, and had to wear braces for two years following surgery) *with Hietpas v. Sec'y of Health & Human Servs.*, No. 19-1702V, 2021 WL 688620 at *6 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (awarding $140,000.00 when petitioner underwent restorative dental work that included wearing an intraoral splint for 18 hours per day for a year).

The decision in the instant matter is in no way meant to minimize the last few hours of A.E.S.'s life. Certainly, there is no injury more severe than death. Petitioners were found entitled to compensation for the death of A.E.S. and therefore are automatically awarded the statutory death benefit. During the afternoon following her vaccinations, A.E.S. was not her usual self, was "spaced out", fussing, not cuddling or snuggling, feeding less, and seeking comfort. Pet. Ex. 136 at 2. Dr. Shuman testified that A.E.S.'s behavior demonstrated her distress, and the hyperextended positioning of her body when found was indicative of an encephalopathic process. Pet. Br. at 7-8 (citing Tr. 22-23, 40, 142-46). As specifically addressed in the ruling on entitlement, what transpired in the 45 minutes to an hour after A.E.S. was put in her bassinet remains unknown, and how or why she came to be in the posture in which she was found unobserved. Respondent did not attempt to describe A.E.S.'s awareness of her injury, but rather asserted that her age made it "impossible to know" her ability to understand her injury. Resp. Br. at 7.

One's pain and suffering are incredibly difficult to translate into money, so special masters look to similar cases for guidance. *See*, *e.g.*, *Doe 34*, 87 Fed. Cl. at 768. However, there are very few cases that are instructive in this matter. In *Graves*, the full $250,000.00 was awarded where the child suffered from seizures for forty-five days preceding her death. *Graves*, 109 Fed. Cl. at 580. In *Boatmon*, as discussed by both parties herein, the proffered award appeared to be $50,000.00 for pain and suffering for the death a five-month-old, one day after his vaccinations. *See Boatmon*, 2018 WL 829155 at *1. The facts of *Boatmon* bear some similarities to the instant matter. Like A.E.S., the infant in *Boatmon* was withdrawn and fussy, but unlike A.E.S., he suffered from fever and sleeplessness. Further, while A.E.S. lived for approximately eight hours after receiving her vaccinations, the infant's death in *Boatmon* was 24 hours later. *Id*. Additionally, in *Rodela*, the proffer included an award of $60,000.00 in pain and suffering for a child who suffered encephalitis that led to her death approximately 19 days after vaccination. *Rodela v. Sec'y of Health & Human Servs.*, No. 17-236V, 2024 WL 4039678 (Fed. Cl. Spec. Mstr. Aug. 8, 2024). The child in *Rodela* was one year old at the time of her vaccination and suffered an observed seizure prior to her death. In addition to the seizure, the child displayed sickness behaviors in the 19 days between her vaccination and leading up to her death. She was described by her parents as cranky, unable to be comforted, not nursing well, and eating less. Her symptoms were similar to those of A.E.S., but for a much longer duration. *Rodela v. Sec'y of Health & Human Servs.*, No. 17-236V, 2024 WL 2034220 at *4-*6 (Fed. Cl. Spec. Mstr. Apr. 5, 2024).

Respondent argues that, based on *Boatmon* and the differences in duration of the respective injuries, an award for pain and suffering in this case should be less than $50,000.00. Resp. Br. 8. While I find this argument persuasive, and though the duration in *Boatmon* was longer than that in the instant matter, it has been several years since the proffer in *Boatmon*. A.E.S. was clearly not feeling well, and her autopsy showed swelling of the brain. It is unclear how swelling on the brain will manifest behaviorally in an 11-week-old infant. While some infants may cry or scream, others

8

like A.E.S. may be subdued, whimpering, and moaning. Her ability to understand her injury at 11 weeks old is limited and not well understood, and while A.E.S. certainly had the awareness to feel unwell and react to pain following her vaccinations, those responses appear to be more primal than knowing. However, petitioners testified at length about how A.E.S.'s behavior was abnormal for her, and I find this testimony from her parents to be relevant to her pain and suffering.

Based on a review of the entire record, consideration of the facts and circumstances presented here, analysis of other cases, and my own expertise in deciding Vaccine Program cases, I find an award of $50,000.00 to be appropriate and reasonable for actual pain and suffering.

## VI.     Conclusion

In determining an award in this case, I do not take likely the loss petitioners have suffered. For the reasons discussed above and based on consideration of the record as a whole, petitioners are awarded:

> **A lump sum payment of $300,000.00,** representing compensation for petitioners' actual pain and suffering ($50,000.00) and the statutory death benefit ($250,000.00), **to be paid through an ACH deposit to petitioners' counsel's IOLTA account for prompt disbursement.**
>
> This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of Court is directed to enter judgment in accordance with this decision.[5]

**IT IS SO ORDERED.**

<u>s/Mindy Michaels Roth</u>
Mindy Michaels Roth
Special Master

---

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of a notice renouncing the right to seek review.